Statement.
MONROE, J.
This is an action in damages for personal injuries alleged to have been ■sustained by Charles J. Nassauer while in the discharge of his duties, in the employ of the defendant company, as conductor of an electric street car. There was judgment in the district court in favor of the plaintiff, and the defendant appealed, after which the original plaintiff died, and his widow, as such, and as tutrix, now prosecutes the .appeal.
The petition alleges:
“That the motorman on said car No. 153 (being the car which inflicted the injuries complained of) was incompetent and unused to the ■operation of such cars, and the accident occurred through his fault, and no fault of petitioner. That petitioner had no control over the employment, hiring, or appointment of said motorman, and had a right to presume that the said employe was trained, experienced, skilled, and fit for the proper performance of the duties required of him by the defendant.”
The defendant, for answer, denies the allegations of the petition, and alleges that, if plaintiff sustained the injuries complained of, it was entirely through his own negligence, and that the motorman was the fellow servant of the plaintiff, for whose negligence defendant is not liable. ’
The facts, as we find them from the record, are substantially as follows, to wit: On the morning of July 5, 1905, ear No. 153, of the Canal & Claiborne line was taken from the barn by Nassauer, as conductor, and Ebarra, as motorman; its immediate destination being the terminus on St. Claude street just below the corner of Louisa, which was to be reached, partly by means of the track on the river side of St. Claude street, and from which the car was to return up town to engage in the regular service of the day, partly by means of parallel track, on the woods or swamp side of St. Claude street. In order to get from the one track to the other, at a point perhaps 90 feet from the terminus, it was necessary for the car to pass through a switch, or “crossover,” by which the two tracks are connected, and, as there is no connecting feed or trolley wire, it was necessary for the conductor to disconnect the trolley, as the car entered the switch, from the wire with which it was then connected, and allow the car to pass through, with the momentum acquired, after which it was his duty to swing the trolley around to the other end of the car (that which had been the forward end on the trip down), and there connect it with the feed wire of the other track, so that it would be in position for the return trip ; and those steps were taken in the order stated. That is to say, as the ear entered the switch, the conductor pulled down, and disconnected, the trolley, and, when the car had passed through the switch and had been stopped on the other track, he jumped off and ran forward to the other end, swinging the trolley along with him, and there, taking his position in front of the car, he connected the trolley with the feed wire of the track upon *478 which the car was then standing; the result being the instantaneous application of the • electric power to, and a forward movement of, the car, whereby he was driven against another car, which was standing on the track, .and quite seriously injured. The conductor, before connecting the trolley with the feed wire, . did not look to see where the motorman was, or what he was doing, or to ascertain whether he had, by removing the controller and reverse handles, placed the car in such a con- . dition as that it would not be affected by the application of the electric power, or, if affected, would move away from him (the conductor) instead of against him; and, in point • of fact, the motorman had not removed the handles, but was engaged in so doing, and would in all probability have accomplished it, and thus have avoided the accident, had it not been that, in taking hold of the controller handle, which moves very lightly, it slipped .to the first notch on the controller box, and thus opened or supplied the way for the electricity (applied to the car, by the ■conductor, in connecting the trolley with the feed wire) to reach the wheels of the car, from which it would have been cut off if the controller handle had come directly off, without moving laterally to the first notch. The ■ conductor, who had been in the employ of the ■ company for some 15 months, could not but have known, and we think did know, of the possibility of such an accident. He knew that, when he cut off the power from the car, • by disconnecting the trolley from the feed wire of the track upon which he had come • down, and the car had thereafter been stopped, there was no possibility of its moving until he again applied the power, by connecting the wire and trolley on the other track. He also knew that, upon his making such connection, the car would certainly move, ■ unless the power was cut off from the wheels .-at the controller box. The evidence makes tit clear that all conductors know these facts, and the plaintiff did not deny that he knew them. The evidence also makes it clear that, having such knowledge, those conductors who are at all prudent wait, under conditions such as those by which the plaintiff was, confronted, and do not apply the power to the car until they have seen that the motorman has removed his controller and reverse handles, and it is thus made sure that such power, when applied, will not reach the wheels. The motorman of the ear in question is shown to have been about 24 years of age, 5 feet 8 inches in height, weighing about 150 pounds, physically sound, fairly quick and intelligent, sober, and of good character. He attended school for two years, and at the age of 14 began to work, and has continued to work, with his hands, since that time, having been employed, among other places, in saw and planing mills in the neighborhood of dangerous machinery. I-Ie and his family were known to some of the officers or employes of the defendant company. He was examined by the company’s physician, and, having been found physically competent, was drilled for 9 or 9% days, on its different lines, in the duties of a motorman. He was then examined as to his knowledge of the company’s rules and regulations, and, having passed satisfactorily, was assigned to work as an “extra,” in which capacity he operated cars, off and on, from June 20, to July 5, 1902, when the accident occurred, and thereafter, until some time in August, when he voluntarily left the service of the company in order to better his condition. There is not a word in the record which reflects upon him in anyway, andwearesatisfiedthatbe was fully competent to discharge the duties imposed upon him.
Opinion.
The grounds of action stated are: That the motorman was incompetent, and that it was through his negligence, and not from any want of care on the part of the person in *480 jured, that the accident occurred. We have found, as a fact, that the motorman was not incompetent, and nothing more need be said on that subject. We are also of opinion that he is not shown to have been negligent. At the moment of the accident he was engaged in removing the controller and reverse levers, or handles, and it was necessary that the operation should have been completed before the conductor could, with safety to himself, have reapplied the electricity to the ear; and that fact was as well known to the conductor as to the motorman. But, although the conductor could have known, merely by seeing that which was before his eyes, that the motorman was engaged in removing the handles, and, hence, that he had not removed them, he failed to make use of his sight, and not deliberately, but negligently, applied to the car the power which caused his injury, and which at the moment was under his, and not the motor-man’s, control. The obligations of the conductor, under the circumstances, were in no wise affected by the fact that, in attempting to take off the handle of the controller, and thereby cut off the electricity from the running gear of the car, the motorman accidentally moved it in a direction not intended, since the handle moves lightly, and such an accident is shown to be of not infrequent occurrence, and happens, without negligence, to the most cautious of men. No matter, however, what prevented his doing so, the fact remains that the motorman had not taken the handle off, and that the conductor, who had run around to that end the moment the car had stopped, had no reason to suppose that he had taken it off, but, on the contrary, by the most casual use of his sight, could have informed himself that the motorman was still on the platform at that end of the car, and that he had not yet taken off the handle, and hence that it would be dangerous for him (the conductor) to apply the power. This view of the case renders it unnecessary that we should consider the question whether the conductor and motorman were fellow servants who assumed the risk of each other’s negligence.
Eor the reasons thus assigned, it is ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that the demand of the plaintiff be rejected and this suit dismissed, at the cost of plaintiff in both courts.